218 N.J. Super. 111 (1987)
526 A.2d 1144
ARTHUR SHEBAR, PLAINTIFF-APPELLANT,
v.
SANYO BUSINESS SYSTEMS CORP., A CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 12, 1987.
Decided June 10, 1987.
*113 Before Judges PRESSLER, BAIME and ASHBEY.
Dennis Alan Cipriano argued the cause for appellant (Dennis Alan Cipriano, attorney; Vivian Marmaras and Stephen R. Seely, on the brief).
Raymond R. Wiss argued the cause for respondent (Winne, Banta, Rizzi, Hetherington & Basralian, attorneys; Raymond R. Wiss and Donald A. Klein, of counsel; Corinne M. Mullen, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
Plaintiff Arthur Shebar instituted this action against his former employer, defendant Sanyo Business Systems, claiming that he had been wrongfully discharged and was also the victim of its actionable fraud and its malicious interference with his *114 prospective employment by its competitor, Sony Corporation. He appeals from the entry of summary judgment dismissing his complaint. We reverse.
The record on the motion for summary judgment, viewed most favorably to plaintiff, permitted the finding of the following facts. Sanyo, a Delaware corporation whose principal place of business is in Bergen County, New Jersey, is a wholly owned subsidiary of a Japanese company. It hired Shebar as national sales manager for its computer division in December 1981. No written contract was then entered into. Shebar continued in this employment for the next several years, receiving frequent commendation from his superiors as well as increased responsibilities and remuneration. His certification asserts that he was frequently congratulated on his successful sales performance and that in early 1984 "defendant won an award and I was singled out by my superiors as being principally responsible for that award. My participation in this award was published in numerous Tokyo publications."
Despite his apparent success with Sanyo, Shebar nevertheless decided in September 1984 to seek other employment, having come to the conclusion that it was Sanyo's policy to employ only Japanese nationals in levels of employment higher than his and objecting to what he referred to as Sanyo's insistence on Japanese quota-setting sales practices, which he regarded as unsound in the context of American business enterprise.[1] He *115 then consulted an executive search firm where he dealt with a Mr. Mersand, who arranged an interview for him with Sony. Sony offered him a position as national sales manager with "an expressed assurance" that he would become a vice-president "within a reasonable period of time." Shebar accepted the Sony offer, having first determined that Sony did in fact employ American vice-presidents and that it did not engage in the business practices he found objectionable.
The critical events are alleged to have taken place on October 1, 1984, when Shebar submitted his written resignation to Sanyo. According to his certification, he was then called into the office of his superior, Mr. Yamazaki. An executive vice-president and apparently Shebar's immediate superior, Mr. Yamashita, was also present. The two expressed their dismay and, as Shebar describes it, the following then occurred:
9. * * * Mr. Yamazaki held my resignation letter and dramatically ripped it to shreds. Mr. Yamazaki was Sanyo's president and he stated "I will not accept your resignation. We will solve your problems". The remainder of the meeting seemed to be positive and productive. I was told by both gentlemen that my performance was exceptionally good, that I had achieved results for Sanyo which they never really expected could have been achieved, and that they [were] unaware of my concern for the "Japanese way" of doing business (versus the American way). I was asked to state the problems which I found, and I did in detail. Messrs. Yamashita and Yamazaki met all of my requests *116 and then insisted that I not accept the Sony offer. Although money was not discussed in detail, they assured me that I was to receive a substantial remuneration increase in March 1985.
10. At that meeting, Messrs. Yamazaki and Yamashita expressly stated to me that Sanyo does not fire its managers. I was told that I had a job for the rest of my life. I was told that Sanyo had never fired, and never intended to fire, a corporate employee whose rank was manager or above.
11. I was impressed with this meeting and I believed all of the statements, promises and commitments made by Messrs. Yamashita and Yamazaki.
In reliance on the promises made to him, Shebar agreed to stay with Sanyo, rescinding his acceptance of Sony's job offer. Within a few days thereafter, he explained these circumstances to Mersand, the executive recruiter, who expressed surprise, telling Shebar that he, Mersand, had information respecting Sanyo's current efforts to replace him. Shebar communicated this information to Yamashita, who denied its accuracy and theorized that Mersand was only attempting to encourage Shebar to change jobs in order to ensure the placement fee. Shebar accepted Yamashita's explanation and assurances and consequently refused to believe Mersand's continued intelligence that Sanyo was indeed still seeking to replace him. On February 5, 1985, some four months after this event, Sanyo's president summoned Shebar to his office at the end of the business day, fired him, handed him a check for severance benefits, and instructed him to clean out his desk and to leave the premises forthwith.
This action ensued. Shebar's complaint alleged, in addition to breach of contract, fraud and malicious interference, causes of action for the torts of outrage and defamation. Defendant's motion for summary judgment was granted as to all five counts. While we agree with the trial judge that the outrage and defamation counts were not at all supported by the record on the motion, we are nevertheless satisfied that a factual basis for the other three causes was sufficiently demonstrated to preclude summary judgment. Consequently, we reverse the dismissal of those three counts.
*117 With respect to the fraud and malicious interference counts, both rested upon Shebar's factual assertion that at the time he submitted his resignation and told his Sanyo superiors that he had accepted the Sony offer, Sanyo induced him to stay and to forego the Sony opportunity with the then intention of replacing him in the near future. He thus asserts that Sanyo made the false promises and representations on which he relied to his detriment, knowing them to be false, intending him to rely upon them, and understanding that if he did rely he would be damaged, as he ultimately was, both by giving up the Sony employment and by losing his Sanyo employment. We are persuaded that this factual thesis not only is supported by permissible inferences which can be drawn from the summary judgment record but also that, if proved, it would support both tort causes of action.
As to the fraud allegation, it is well settled that the constituent elements of that cause of action are the defendant's false representation, his knowledge of or belief in its falsity, his intention that plaintiff rely, plaintiff's reasonable reliance, and plaintiff's consequent damage. See, e.g., Bilotti v. Accurate Forming Corp., 39 N.J. 184 (1963); Louis Schlesinger Co. v. Wilson, 22 N.J. 576 (1956); United Jersey Bank v. Wolosoff, 196 N.J. Super. 553 (App.Div. 1984); Foont-Freedenfeld Corp. v. Electro-Protective Corp., 126 N.J. Super. 254 (App.Div. 1973), aff'd o.b. 64 N.J. 197 (1974). Genuine factual issues as to all these elements have been raised. Insofar as we are able to determine, the trial judge dismissed the fraud count because he did not read the motion papers as supporting the allegation that when Yamashita and Yamazaki made their promises to Shebar and induced him to forego the Sony employment, they then had the intention of firing him in the near future. We disagree with this perception. In our view, the events and their chronology as recited by Shebar, including the information he received from Mersand which his Sanyo superiors expressly denied when he confronted them with it, clearly permitted the inference that they intended, at the time they induced him to revoke his Sony *118 acceptance, to terminate his employment. We do not intend to suggest that any such inference is required to be drawn. The point is simply that such an inference is entirely legitimate, and it is hence for the finder of fact to draw it or not.
As to the malicious interference claim, we have no doubt that the cause of action would lie as well if the finder of fact were to conclude that Sanyo, by deceit, induced Shebar to revoke his acceptance of Sony's offer in order to retain his services only while it sought to replace him or to deprive its competitor of his services or both. See, e.g., Harris v. Perl, 41 N.J. 455 (1964); Raymond v. Cregar, 38 N.J. 472 (1962); Leslie Blau Co. v. Alfieri, 157 N.J. Super. 173 (App.Div. 1978), certif. den. 77 N.J. 510 (1978) sub. nom. Leslie Blau Co. v. Reitman. We conclude, moreover, that this factual conclusion is also reasonably inferable on this record. The trial judge was of the view that Sanyo's promises and representations which induced Shebar to turn down the Sony offer constituted mere puffing. That might in the end be a reasonable interpretation of the facts. It would not, however, be a reasonable interpretation if the fact-finder were to conclude, as it could, that Sanyo was not merely trying to keep an employee who had expressed an intention to accept other employment but that it did so with the intention of itself dispensing with this services after that other employment was no longer available to him. Deceitfully preventing an employee whom it does not intend to retain from accepting other employment does not advance the employer's own legitimate interests and is clearly actionable.
We come now to the most problematical of plaintiff's remaining claims, the breach of contract count. Shebar asserts that the oral promises made to him by Yamashita and Yamazaki on October 1, 1984 constituted an enforceable undertaking by Sony to terminate his employment only for good cause. The trial judge, however, construed Sanyo's alleged promises as an unenforceable "friendly assurance" of lifetime employment. He therefore concluded that despite these promises Shebar remained *119 an employee at will, dischargeable at will, so long, of course, as the discharge was not based on motives of prescribed discrimination or other violation of public policy. The judge relied on Savarese v. Pyrene Manufacturing Co., 9 N.J. 595 (1952), which adopted the then generally prevailing view that
* * * in the absence of additional express or implied stipulations as to duration, a contract for permanent employment, for life employment or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and therefore, a discharge without cause does not constitute a breach of such contract justifying recovery of money damages therefor.
[Id. at 600-601]
The judicial reluctance to enforce contracts for life employment, Savarese further explained, is based on their "variance with general usage and sound policy." Id. at 601. Accordingly, "[a]greements of this nature have not been upheld except where it most convincingly appears it was the intent of the parties to enter into such long-range commitments and they must be clearly, specifically and definitely expressed." Ibid.
During the three-and-a-half decades which have elapsed since Savarese was decided, there has been perceptible erosion of the predicate of the lifetime employment rule there enunciated. In short, the job security represented by the concept of lifetime employment, which is more realistically articulable as employment terminable only for cause, is no longer regarded as contrary to general usage or sound policy. Thus, in Woolley v. Hoffman-La Roche, Inc., 99 N.J. 284 (1985), the Supreme Court, in criticizing much of the Savarese rationale, pointed out that "[t]he at-will rule [on which Savarese is based] has come under severe criticism from commentators who argue that the economic justifications for the development of the rule have changed dramatically and no longer support its harshness." Id. at 290. With respect to the so-called lifetime employment contract, the Court noted that "[j]ob security is the assurance that one's livelihood, one's family's future, will not be destroyed arbitrarily; it can be cut off only `for good cause,' fairly *120 determined.... * * * [It is] what working men and women regard as their most basic advance." Id. at 300. It was thus in the context of modern economic reality, an enlightened view of the fundamental equities demanded of the work-place, and an appreciation of the reasonable expectations of employees that the Supreme Court concluded in Woolley that a promise of lifetime employment, at least in the sense of a promised termination for good cause only, may be enforceable if the promise is predicated upon a consistently applied and generally applicable employer policy as stated in its distributed employee manuals.
The legal question then is whether the holding in Woolley was intended by the Supreme Court to be limited to a general employer policy expressed only by way of a manual or handbook or whether it was intended to extend to a definitive, established, company-wide employer policy, however expressed. We conclude that the thrust of the Woolley holding and the rationale as well as the public policy on which it is based is directed to the existence of the employer's general policy rather than the form in which it is expressed. The difference between a manual or handbook policy and a policy otherwise expressed presents, in our view, an issue of proof rather than of substance. We thus concur with the courts of other states which have not limited the enforceability of an employer's policy statements assuring termination of employment for good cause to those appearing in manuals only. See Leikvold v. Valley View Community Hosp., 688 P.2d 170, 174 (Ariz.Sup.Ct. 1984) (holding enforceable such a policy statement made in a manual or otherwise or expressed "by the employer's actions"); Toussaint v. Blue Cross & Blue Shield of Mich., 408 Mich. 579, 292 N.W.2d 880, 885 (1980) (holding that an employer's promise that an employee will be discharged only for cause may become an enforceable part of the employment contract "as a result of an employee's legitimate expectations grounded in an employer's policy statements," which, in respect of plaintiff there, were orally made[2]); Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, *121 457 N.Y.S.2d 193, 443 N.E.2d 441, 445-446 (1982) (permitting a job security policy to be proved based on the totality of circumstances including the employer's oral promise); Thompson v. American Motor Inns, Inc., 623 F. Supp. 409, 416 (W.D.Va. 1985) (Virginia law permits rebuttal of an at-will status by evidence of a contrary "custom, practice, or policy that governs the employer-employee relationship."). See also McQuitty v. General Dynamics Corp., 204 N.J. Super. 514 (App.Div. 1985) (job security could be based on a promise expressed in a telegram offering employees the right to return to work).
Plaintiff, of course, bears the burden of proving the existence of a company policy of non-termination of managers except for cause. We note further that the oral statement of policy by his superiors is probative only if plaintiff is able to prove that their statements constituted an accurate representation of policy which they were authorized to make. But, however formidable that burden of proof may be, there is no warrant at this stage of the proceeding for precluding plaintiff from attempting to meet it.
One final matter requires our attention. Sanyo argues that even if there were a policy of termination for cause only, *122 plaintiff waived the benefits thereof by accepting termination payments which were characterized as such by Sanyo. The trial judge agreed, but we do not. As a matter of basic principle, it is well settled that waiver involves the intentional relinquishment of a known right, and consequently it must affirmatively appear that the party charged with waiver knew of his legal rights and deliberately intended to relinquish them. See West Jersey Title, etc. Co. v. Industrial Trust Co., 27 N.J. 144, 153 (1958); Allstate v. Howard Savings Inst., 127 N.J. Super. 479, 488 (Ch.Div. 1974). Thus, waiver "implies an election by the party to dispense with something of value, or to forego some advantage which he might at his option have demanded and insisted on." Geo. F. Malcolm, Inc. v. Burlington, etc., Co., 115 N.J. Eq. 227, 232 (Ch. 1934). It may well be, as defendant contends, that termination pay constitutes, conceptually, consideration for loss of the employment. See, e.g., Western Electric Co. v. Hussey, 35 N.J. 250, 257 (1961). But it does not inexorably follow, as a matter of law or logic, that one who accepts proffered termination payment when he has been fired has thereby unequivocally and decisively expressed his election to forego his legal right to challenge the lawfulness of the termination. There is nothing in this record to suggest that either Sanyo or Shebar had any reasonable expectation of any such automatic consequence, and Shebar expressly denied that he did, asserting that he was never advised by Sanyo, either orally or in writing, that acceptance of the benefits "constituted an agreement or a waiver of my rights or a release of my claims or a termination of Sanyo's obligations to me." The viability of the waiver defense is, like the other issues here raised, a matter for the fact-finder. It was inappropriately decided on this summary judgment motion.
The summary judgment, insofar as it dismissed the outrage and defamation counts of the complaint, is affirmed. In all other respects it is reversed and the matter is remanded to the trial court for further proceedings.
NOTES
[1] Shebar asserted in his certification that early in his Sanyo employment, he received a memorandum from his superior, Mr. Yamashita, excoriating him for not having met the completely unrealistic sales quota which the company had set for his division. Yamashita, he says, then explained to him "that such memoranda were part of the standard `Japanese' practice utilized to exhort and `push [employees] to the utmost' to achieve extraordinary performance" and were intended "to be utilized by me to `push to the utmost' those reporting to me." He continued to receive such memoranda regularly, was nevertheless orally assured that he was doing extremely well, and was periodically told that the Japanese procedure "was to establish `forecasts' and sales objectives which were not only extraordinarily high but, finally, incapable of fulfillment." The theory behind this practice, he was told, "was to push managers and their subordinate sales personnel to strive to achieve sales objectives which they otherwise would never even bother to attempt to attain." Shebar further described this practice as an "exhortation to achieve the impossible, implemented by the device of always belittling performance." These assertions by plaintiff were in response to Sanyo's certification in support of summary judgment, suggesting, although concededly irrelevant to the legal theory of the motion, that Shebar's performance had been unsatisfactory. That certification had annexed to it a series of such devastatingly insulting memoranda but omitted the one annexed to Shebar's answering certification in which Yamashita, while acknowledging that Shebar had achieved sales for the period in question in the amount of 124 percent of his quota, nevertheless criticized him because "profit is still at sacrifice" and urged him to "continue to make an effort to cut off the expenses as much as possible." Shebar's explanation of these memoranda is further supported by his assertion that his 1983 sales showed a 466% increase over 1982, and 1984 showed a 215% increase over 1983.
[2] The rationale of the Michigan court was that:

While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "instinct with an obligation." [292 N.W.2d at 892; citations omitted]