**George J. CARNEY, Plaintiff,**

v.

**DEXTER SHOE COMPANY, Defendant.**

**Civ. A. No. 87–4468.**

United States District Court,
D. New Jersey.

Dec. 13, 1988.

tions with respect to Becker Paribas appear weaker than those concerning Waste Recovery and Quanta Holding.

Jeffrey Campisi, Sharkey & Campisi, Roseland, N.J., for plaintiff.

Carmine A. Iannaccone, Mary Ellen Scheuer and Hannoch Weisman, Roseland, N.J., for defendant.

## OPINION

LECHNER, District Judge.

In this action, plaintiff George J. Carney ("Carney") alleges that the defendant Dexter Shoe Company ("Dexter") is liable for violating the following in connection with his termination on November 13, 1985: the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, (First Count of Plaintiff's Complaint); the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–12(a), (Second Count); the clear mandate of the public policy of the State of New Jersey (Third Count); an implied promise of job security, good faith and fair dealing (Fourth Count); and an express and implied contract of employment (Fifth Count). Carney also alleges that Dexter intentionally inflicted emotional distress upon him (Sixth Count). Carney seeks compensatory and punitive damages.

Now before the court is Dexter's motion for summary judgment. It is Dexter's position that Carney was an independent sales representative, not a Dexter employee, and thus his relationship with Dexter is not governed by ADEA or NJLAD and further that the relationship was for an indefinite duration and thus terminable at will by either party.

*Facts*

Carney is currently sixty years old and has been a resident of New Jersey since 1975. Prior to the termination of the working relationship, Carney had worked for Dexter in various capacities for a period of nineteen and one-half years. In his most recent position, Carney has described himself as a "self-employed rep[resentative]" of Dexter (T:21–19).[1]

Dexter is a corporation chartered in the State of Maine[2] and, according to plaintiff's Complaint, is a corporation with its principal place of business in the state of Massachusetts. Dexter is engaged in the manufacture and sale of shoes.

Carney joined Dexter in 1966, at age thirty-eight, as an in-stock shoe salesman. His territory included New Jersey and Southern Connecticut. As a shoe salesman at this time, Carney's compensation was based strictly on commission as a percentage of sales; no salary or bonus was paid. Within a few months, Carney was given a new position with Dexter in Boston where, as an executive salesman, he sold to approximately forty national accounts, including Sears Roebuck and other large department stores. In this position, which Carney held for nine and one-half years until 1975 (when Dexter eliminated the division), he was paid a yearly salary and usually received a bonus. In 1975, Carney reassumed his duties as a Dexter salesman responsible for the Northern New Jersey and Long Island territory. Once again, Carney was on a commission only based income.

While Dexter claims Carney was barely getting by in his various positions, Carney claims he was so successful that he took a territory yielding a commission income to his predecessor of $33,000 in 1975 and increased the business to the point where he was earning $100,000 as early as 1980. Carney also alleges that, in addition to his work as a salesman, he made other contributions as well, most notably in the research and design area. Over ten years ago, Carney alleges he helped develop the "Suburban," a particularly well-selling shoe line for Dexter. It is not clear whether Carney received any compensation for such work over and above the extent to

---

1. *"T–" refers to transcript of the deposition testimony of George Carney, dated April 8, 1988. "T2–" refers to transcript of deposition testimony of George Carney, dated April 22, 1988. "T3–" refers to transcript of deposition testimony of George Carney, dated May 6, 1988.*

2. As discussed further below in connection with the jurisdiction of this court to hear Carney's state law claims, it has not been alleged in the Complaint where Dexter is incorporated. This fact has been gleaned from Dexter's brief. Nor does the Complaint in the jurisdictional section state that relief in excess of $10,000 is sought.

which he was paid commissions as a salesman.

As an in-stock salesman, Carney was free to terminate his employment with Dexter at any time although he stated he would have to give up certain earned commissions (T2:28–10 to 28–14). Carney was free to establish his own work agenda and to visit accounts as he saw fit; Dexter did not require Carney to work any specific hours during the day or to make any minimum number of customer calls per day (T2:7–21). Carney was not provided with an office nor was he reimbursed for the costs incurred in furnishing or staffing one (T2:12–22 to 13–33). Carney received no schooling, training or formal direction from Dexter on how to sell their products (T:19–25 to 20–11).

Carney was not provided with a company car, nor was he reimbursed for travel or other related expenses; he fully funded all of his expenses (T:39–23 to 40–4; T2:5–15); Carney received no reimbursement for attending annual sales meetings (T2:5–15). Carney paid all of the travel and entertainment expenses which he incurred doing Dexter related business (T:40–6).

Dexter did not provide Carney with any financial benefits such as a pension, insurance or profit sharing (T2:5–7 to 5–18); Carney did not receive sick pay or paid vacations (T2:8–7); Carney was responsible for paying his own social security and income tax; Dexter did not automatically compute and withhold any amount for any purpose (T2:6–2 to 7–2).

Carney states, however, that Dexter exercised significant control over his activities. For example, Dexter precluded Carney from selling products other than those manufactured by Dexter. (Carney Affidavit at ¶ 4; T2:13–25). During his years doing in-stock sales work, Carney reported to Dexter headquarters almost daily by phone (although he set his own daily agenda) and was required to submit in writing weekly reports on forms provided by Dexter. (Carney Affidavit at ¶ 5; T2:22–4 to 24–20). In addition, Carney was subject to various other guidelines (most of which were procedural) set forth in the Dexter Sales Manual. (Carney Affidavit at ¶ 5).

Dexter exercised control over the types of shoes which Carney could sell, the delivery dates for shipping supplies to customers and the timing of when Carney could open new accounts. (Carney Affidavit at ¶ 6; T2:18–20 to 21–24; T2:103–1 to 106–3). As evidence of the extent to which he was dependent upon Dexter for income, Carney claims he was restricted from engaging in other enterprises and was precluded (under the terms of Dexter's Sales Manual) from selling Dexter shoes other than to customers who met certain Dexter criteria, such as minimum purchase amounts of fifty pairs of shoes. Carney does not claim there was an unreasonably limited number of potential customers to whom he could make sales calls.

As a Dexter salesman, Carney claims he was prevented from taking vacations except during short periods of time when the selling season was over, (Carney Affidavit ¶ 6; T2:8–9), however, it was not necessary that Carney receive prior approval from Dexter prior to taking a vacation. (T2:8–17 to 9–23). Carney was also required to contribute monthly expenses of between $100 to $250 for use of a showroom which he had little opportunity to use. Twice a year Dexter would provide Carney with a performance analysis, which he would discuss with one or two Dexter sales managers. (Carney Affidavit ¶ 7; T:77–80).

Despite what he regards as the exercise of such control over his sales activities, or perhaps because of it, Carney felt a personal attachment to Dexter and thought Dexter felt similarly. At one point, Carney claims he passed up an opportunity to become a partial owner in an import firm, having been led to believe by Dexter that his future was secure there. (T:56–19 to 69–8; T2:25–23 to 31–3). Carney claims that he was led to believe throughout the course of his "employment" that, so long as he continued to use his best efforts as a salesman, he would have a job for life at Dexter. (Carney Affidavit ¶ 8).

Beginning in early 1984, Carney began to notice that new, younger salesmen were

replacing the older salesmen at Dexter. At one point Carney was told by his former "boss" that Dexter management believed in the mid–80s that much of the Dexter sales staff was too old to relate to the younger buyers in the marketplace. (Carney Affidavit ¶ 9). On or about November 13, 1985, Carney was notified his relationship with Dexter was then terminated, effective immediately. In Carney's words: "I was advised by Stan Kieon, National Sales Manager for Dexter, that Dexter was not happy with me and that he had to fire me. No valid reason was given for my discharge." (Complaint filed with E.E.O.C.)

Since Carney was terminated, he claims he has been unable to enjoy a normal night's sleep. He developed persistent stys in both eyes which he associates with the termination. He also suffers from embarrassment, social difficulties and emotional outbursts related to his firing. Finally, his marital relations have suffered to the extent that his wife would like to see him seek professional help. (Carney Affidavit ¶ 11; T3:28–8 to 38–2).

After conducting discovery, Dexter moves for summary judgment on all federal and state law claims. Dexter argues it is entitled to summary judgment because, as set forth above, (1) Carney was an independent sales representative and not an employee of Dexter's and thus his relationship with Dexter is not governed by ADEA or NJLAD and (2) the relationship was for an indefinite duration and thus terminable at will by either party.

*Discussion*

A. Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The district court's task in deciding the motion is not to "determine the truth of the matter but to determine whether there is a genuine [factual] issue" which can only be properly resolved by a trier of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *See Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a fact issue,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. ... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

*Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (emphasis in original, citations and footnotes omitted).

■ The Court elaborated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted): "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." The Supreme Court went on to note in *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986) (footnote omitted): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." Thus, once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed.R.Civ.P. 56(e).

B. Federal Age Discrimination Claim

■ ADEA makes it unlawful for an employer

to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privleges or employment because of such individual's age. . . .

29 U.S.C. § 623(a)(1). The proscription against age-based employment discrimination protects individuals who are forty years of age or older. 29 U.S.C. § 631(a).[3]

It is well settled that in order for a plaintiff to prevail under ADEA it must first be established that he was an employee, or prospective employee, of the defendant. It was not the legislative intent of Congress to redress discrimination against independent contractors under ADEA. *See E.E.O.C. v. Zippo Mfg. Co.,* 713 F.2d 32, 35 (3d Cir.1983); *Dake v. Mutual of Omaha,* 600 F.Supp. 63, 64 (N.D.Ohio 1984). Thus, the sole issue raised by Dexter's summary judgment motion, as it concerns Carney's claim under Section 623(a)(1) of ADEA, is whether Carney was an employee of Dexter, or merely an independent contractor, at the time the working relationship was terminated.

The Third Circuit's decision in *Zippo* is directly on point. It was recognized in *Zippo* that, an examination of federal cases construing the varied federal statutes reveals the absence of a concept of employee status which fits within all common law and statutory definitions. 713 F.2d at 36. After an examination of the histories of the respective employment tests and their application, the court determined that the hybrid standard, which combines the common law "right to control" with the "economic realities", as applied in Title VII cases, is the appropriate test in ADEA cases. The court reasoned that because the ADEA's substantive prohibitions were derived directly from those under Title VII, and because the determination of employee status is a question relating to substantive prohibitions, the established Title VII hybrid test was intended to apply to the ADEA. *Zippo,* 713 F.2d at 38.

In *Zippo,* the court drew on authority from other circuits and adopted "a hybrid approach which looks at the economic realities of the situation but focuses on the employer's right to control the 'employee' as the most important factor in determining employee status." *Id.* 713 F.2d at 37. The extent of the employer's right to control the "means and manner" of the worker's performance is the most important factor among the various factors that a court must consider under this hybrid standard. *Id.* (citation omitted). Other factors which enter into a determination of employee status under this hybrid standard are:

(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the 'employer' or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; *i.e.,* by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the 'employer'; (9) whether the worker accumulates retirement benefits; (10) whether the 'employer' pays social security taxes; and (11) the intention of the parties.

*Id.* (citations omitted).

It is not necessary for Dexter in order to prevail to demonstrate each of the foregoing factors weighs in favor of "non-employee" status. In *Zippo* the court held that, even if the length of time the plaintiffs worked as district managers for Zippo points toward their status of employees, and even if appellants were required to sell only Zippo products and were economically dependent on the income they earned at Zippo, "these factors are not sufficient to establish that they were employees *when*

---

**3.** The ADEA previously protected only individuals who were at least forty years of age but less than seventy years of age. In 1986, the statute was amended to remove the age ceiling of seventy. Pub.L. 99–592 § 2(c)(1).

*balanced against the other factors* that tend to establish their status as independent contractors." (emphasis added) *Id.* at 38. The court concluded appellants were independent contractors even under the more liberal "economic realities" standard as applied in FLSA cases. *Id.; see Hickey v. Arkla Industries, Inc.,* 699 F.2d 748 (5th Cir.1983).

Where there exist several indicia of employee status, the mere presence or absence of two or three of them—without a reasoned balancing of the above factors—cannot dictate the outcome of a summary judgment motion. Fed.R.Civ.P. 56 and case law require that a genuine issue exist concerning *material* facts to prevent the granting of summary judgment. *Matsushita, supra,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56. In granting the defendants' motion despite the existence of some factors pointing to an employment relationship, *Zippo* explained that the need for materiality inheres in the purpose of resolving disputes by summary judgment: "to eliminate a trial in such cases where a trial is unnecessary and results in delay and expense." 713 F.2d at 35 (citing *Tomalewski v. State Farm Life Insurance Company,* 494 F.2d 882, 884 (3d Cir.1974).)

Although there are not many examples of Third Circuit precedent applying the above quoted hybrid test of employee status, the following passage from *Zippo* is helpful in assessing the weight of the factors as they concern Carney:

> [A]ppellants would be considered independent contractors for ADEA purposes. Zippo exercised virtually no control over the means and manner of appellants' sales practices. Although the district court found that Zippo kept track of appellants' sales, it correctly concluded that this monitoring did not amount to supervision over appellants' work performance. Indeed, appellants had the independence to establish their own business organizations, hire employees and contact any customers within their territories. They were not required to account to Zippo for their daily activities. Appellants were clearly skilled workers who had the right, along with Zippo, to termi-

nate their relationship as Zippo's DMs without explanation on thirty days notice.

> Moreover, DMs were paid a commission as a percent of sales rather than a salary. Thus, their potential for profit or loss was primarily a product of their own initiative and was within their control. Similarly, they furnished their own equipment and places of work and absorbed all of the expenses incurred in their sales efforts. They received no paid annual leave; they accumulated no retirement benefits, and they paid their own social security taxes.

713 F.2d at 38.

Before applying the foregoing test of employee status to Carney, it is interesting to note that Carney, in his depositions, described himself as a "self-employed rep[resentative]" of Dexter. [T:21–19]. Turning to the most important factor in the test, the extent to which Dexter controlled and supervised the means and manner of Carney's performance, while it is recognized that Dexter exercised some forms of control, it cannot be said that it significantly controlled means and manner of Carney's work. Carney claims that he reported to Dexter almost every day and that he was required to submit weekly reports on forms provided by Dexter. Under *Zippo,* the mere monitoring of an independent contractor does not constitute the exercise of control. Carney has not claimed that he was required by Dexter to work any specific hours during the day, or to make any minimum number of customer calls per day. Furthermore, Dexter has a legitimate interest (unrelated to that of exercising authority over its "employees") in keeping up to date on the demand for its shoes so that it plan its manufacturing schedules accordingly.

Carney also claims that Dexter controlled him inasmuch as it restricted the kinds of shoes he could sell, and on what schedules. As indicated above, the plaintiff in *Zippo* was required to sell Zippo products exclusively. In addition, Dexter has an important interest—as do all manufacturers distributing their products

through independent dealers—in regulating the schedules for delivery: a company cannot allow independent salesmen to make delivery commitments to retailers without regard to the company's ability to meet the demand. In short, the fact that Dexter required weekly reports of, and regulated the distribution of shoes through, its salesmen points to a company that administers its affairs carefully through the monitoring of salesmen, rather than to the existence of an employer/employee relationship.

Further on the issue of control, Carney claims that he could only take vacations during the slow season and that he was reviewed twice a year by Dexter officials. While relevant, these facts do not rise to the level of control of the 'means and manner' of Carney's work efforts such that an employment relationship was established. Carney appears to have been free to set his daily schedule as he saw fit, so long as the customers he visited had certain characteristics (i.e., purchased at least fifty pairs of shoes) making them eligible Dexter customers. *Compare Golden v. A.P. Orleans, Inc.,* 681 F.Supp. 1100 (E.D.Pa.1988) (employer exercised abundance of control over daily activities; hours set by company, weekly sales meetings and seminars with company managers, oral and written reports of activities to be prepared daily, and compliance with periodic performance procedures required).

Even if it is concluded Dexter employed significant control over Carney, this is not enough to result in employee status. *Zippo, supra,* 713 F.2d at 38. Looking to the other factors articulated by *Zippo,* most of which go to the economic realities of the relationship, it appears clear Carney was not treated as a Dexter employee. He received as compensation for being a Dexter salesman, a straight five percent commission; he did not receive a yearly salary, a bonus, profit sharing, incentive pay or any other form of compensation; traditional employment benefits such as life insurance, health insurance and retirement plans were not made available to him; he was responsible for his own transportation; he

was not provided with a company car, nor reimbursed for gas, mileage or wear and tear; Carney received no reimbursement for attending annual sales meetings; taxes were not withheld from his monthly commission check; Carney was liable for his own income tax payment and social security tax.

Carney testified he had use of a Dexter showroom in Manhattan for which he had to contribute a monthly fee. He also had an office in his home which operated and was furnished at his expense. He paid for the printing of his own business cards. He paid all of the travel and entertainment expenses which he incurred as a result of Dexter related business. No formal training or education was offered to Carney. In sum, as a matter of law, Carney was an independent contractor. Accordingly, the Dexter motion for summary judgment on the ADEA claim is granted.

### C. New Jersey Age Discrimination and Common Law Claims

Having granted Dexter's motion for summary judgment as to the ADEA claim, the requested dismissal of the state law claims for lack of subject matter jurisdiction will be addressed.

■ Where there exists no federal claim as a matter of law, the rationale for exercising pendent jurisdiction over state law claims generally does not apply. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed. 2d 218 (1966). While, for the reasons set for the below, it is perhaps understandable why Dexter has not argued this as an additional basis for granting its motion as to the state law claims, federal courts, sua sponte, should dismiss claims where subject matter jurisdiction is lacking. *Cameron v. Hodges,* 127 U.S. 322, 8 S.Ct. 1154, 32 L.Ed. 132 (1888); *Randazzo v. Eagle–Picher Industries, Inc.,* 117 F.R.D. 557, 558 (E.D.Pa.1987).

Although Carney has failed to allege in his complaint sufficient facts to support diversity jurisdiction,[4] it appears from what

4. The jurisdictional section of Carney's complaint reads as follows:

is stated in Dexter's brief that such a basis for federal jurisdiction may exist.[5] Presumably Dexter has refrained from raising the issue of the defect in Carney's complaint because it wishes to forego the formality of having Carney refile an amended complaint. Nonetheless, I note the defect and read the pleading requirements for diversity jurisdiction strictly. A plaintiff must clearly allege on the face of the complaint facts which demonstrate complete diversity and an amount in controversy of at least $10,000. Fed.R.Civ.P. 8(a)(1); *Randazzo, supra,* 117 F.R.D. at 558.

Although Carney states that jurisdiction is based upon the existence of both a federal question and diversity, he has failed to indicate what states Dexter is a resident of for diversity purposes. Corporations are residents in their state of incorporation *and* in the state which is their principal place of business. 28 U.S.C. § 1332(c). Although the complaint alleges that Dexter's principal place of business is in Massachusetts, complete diversity is not assured unless it is alleged that Dexter is incorporated in a state other than New Jersey, the state where Carney is a resident. Moreover, Carney has failed to allege any facts which satisfy the amount in controversy test, a necessary predicate to jurisdiction if the ADEA claim is dismissed.

Noting the foregoing pleading defects, however, and in light of the fact that it appears from other sources that the pleading requirements could probably be met in an amended complaint, I do not base my decision to grant Dexter's motion for summary judgment as to the state law claims solely on jurisdictional grounds. Accordingly, I have addressed below each of the state law claims individually.

1. Plaintiff Carney is a resident of the Township of Sparta, State of New Jersey.
2. Defendant Dexter Shoe Company ("Dexter Shoe") is a corporation doing business in the State of New Jersey with a principal place of business at 1230 Washington Street, West Newton, Massachusetts. Defendant Dexter Shoe is engaged, inter alia, in the business of the manufacture and marketing of shoes and other footwear products.
3. This action arises under the provisions of the Age Discrimination and Employment

New Jersey has enacted a statute which parallels closely the ADEA. In the Second Count of Carney's Complaint Carney claims that N.J.S.A. 10:5–12 was violated. That section, in pertinent part, provides:

It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:

a. For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, sex or atypical hereditary cellular of blood trait of any indivudal, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such indiviudal or to discriminate against such individual in compensation or in terms, conditions or privileges of employment...

N.J.S.A. 10:5–12.

As in the case of the ADEA claim, Dexter argues that Carney cannot recover under this New Jersey statute because he was not an employee of Dexter. Looking to certain language in the statute—"because of the ... age ... of any *individual* "—Carney argues that, unlike ADEA, the scope of NJLAD is not restricted to employees. It is noted that "individual" is the same term used in ADEA. While Carney emphasizes the inability of Dexter to provide any New Jersey authority to the effect that the term "individuals" in Section 10:5–12(a) does not cover independent contractors, Carney seems unable to provide any authority of his own. A search

Act ("ADEA"), 29 U.S.C. § 621 et seq., and the rules and regulations adopted and promulgated thereunder. Jurisdiction of this action is conferred on this Court by Section 7(b) of the ADEA, 29 U.S.C. § 626(b), and by the doctrine of pendent jurisdiction. Jurisdiction is also conferred pursuant to diversity jurisdiction under 28 U.S.C. § 1332(a).

5. Dexter indicated in its moving papers that the company is incorporated in Maine.

for a case construing this statute from the above point of view has been unavailing.

The words of the statute itself must be examined, expecially in the absence of New Jersey or other case law on the issue. The statute states that, "it shall be an unlawful employment practice ... (a) *for an employer*, ... to [commit the various act]." Because the proscriptions apply to an "employer,"—as they do under the terms of ADEA—it is inescapable that the "individual" on the receiving end of the employer's conduct must be an employee or prospective employee in order for the statute to apply.

■ There is no reason to read the statute other than in this common sense way. In addition, Dexter correctly points out that "it is a matter of common knowledge that the NJLAD was patterned after its New York parallel." *See N.J.S.A.* 10:5–1, Comments to note 2, p. 381, citing Atty. Gen. F.O. 1941, No. 17. With this in mind, and because the scope of the statute's coverage is so fundamental, Dexter's citation to *Engel v. Calgon Corp.*, 114 A.D.2d 108, 498 N.Y.S.2d 877 (1986), *aff'd*, 69 N.Y.2d 753, 512 N.Y.S.2d 801, 505 N.E.2d 244 (1987) (holding that New York Human rights Law, the parallel to NJLAD, does not cover a salesman because he was an independent contractor and not an employee) is persuasive. On the issue of whether Carney can be considered an employee under the New Jersey statute, it is reiterated that there is no reported case on this point. Because Carney is not considered an employee even under federal standards which are considered liberal, *Zippo, supra*, 713 F.2d at 38 (citing *Hickey*), it does not make sense to reach on a contrary result under NJLAD. Because he was not an employee, Carney's claim under NJLAD fails as a matter of law.

■ Carney then claims that Dexter breached either express or implied contracts of continued employment, an implied promise of job security, good faith and fair dealing, and the clear mandate of New Jersey policy (Counts Three, Four and Five). These claims, however, even after viewing all of the evidence in a light most favorable to Carney, fail as a matter of law. I am not aware of any New Jersey case holding that independent contractors are entitled to such protections. In New Jersey, it is employees who are protected from the tortious acts of their employer in wrongfully or improperly terminating them. *See Woolley v. Hoffman–LaRoche, Inc.*, 99 N.J. 284, 491 A.2d 1257 (1984), *modified*, 101 N.J. 10, 499 A.2d 515 (1985); *Shebar v. Sanyo Business Systems*, 218 N.J. Super. 111, 526 A.2d 1144 (App.Div. 1987), *aff'd*, 111 N.J. 276, 544 A.2d 377 (1988); *McQuitty v. General Dynamics Corp.*, 204 N.J.Super. 514, 499 A.2d 526 (App.Div.1985). Even if Carney were deemed to be an employee, however, the facts indicate that he was employed at will; as discussed below, no express or implied contract of employment existed.

■ As far as an express contract of employment is concerned, when asked whether any express contract of employment existed between him and Dexter, Carney testified: "I never had any form. In fact, I never even signed an employment contract that I know of." (T:8–10 to 8–12).

■ When no express contract of employment exists, plaintiff has the burden of proving that the employment relationship was not "at-will" by offering convincing examples of Dexter's written or oral expressions of its general policy of non-termination except for cause. *Shebar v. Sanyo Business Systems, supra*, 218 N.J.Super. at 120–121, 526 A.2d 1144 (extending *Woolley* rule of implied promise contained in employee manuel to implied promise based on employer's general policy, however expressed). Carney's testimony concerning the existence of an implied employment contract was as follows:

Q. Did Dexter or any of its employees ever imply to you that you would not be terminated except for cause?

\* \* \* \* \* \*

A. A conversation was never held to the effect that unless there is a good cause, you know, we'll only fire you for cause. That's a kind of conversation I've never heard of in business. You do the

right thing and—do you understand what I'm saying?

[T3:41–18 to 42–25]. A long term employment commitment is only enforceable if there is proof of a precise agreement and the long term commitment is supported by consideration from the employee in addition to the employee's continued work. *See Brunner v. Abex Corp.*, 661 F.Supp. 1351, 1356 (D.N.J.1986) (citing to *Woolley v. Hoffman–LaRoche*, 99 N.J. 284, 293, 491 A.2d 1257 *modified*, 101 N.J. 10, 499 A.2d 515 (1985)).

Nothing in the record demonstrates an implied contract of continued employment. Carney did state, without providing any basis, that he was led to believe that, so long as he continued to use his best efforts, he would have a secure future at Dexter. Whatever led Carney to believe this, other than perhaps a comfortable working environment, it was apparently not based upon representations made by Dexter employees,[6] if Carney's above deposition testimony is accurate.

Carney's unexplained belief that he would have a secure future at Dexter cannot preclude Dexter from summary judgment on this issue. *Merrill Dow, supra.* Although *Shebar* has expanded the ways in which a company can be held to have communicated an expectation of continued employment to its employees, it has not eliminated the need, articulated in *Brunner*, to show clear and convincing proof of a precise agreement. 661 F.Supp. at 1356. There is no evidence of implied employment contract in this case, whether contained in an employment manuel or communicated orally in a clear and convincing manner.

■ In the Fourth Count of the complaint Carney also alleges the contractual relationship between him and Dexter im-plied a promise on the part of Dexter of job security, good faith and fair dealing, and that by terminating him Dexter violated those covenants. These claims regarding good faith and fair dealing are quickly dismissed. Again, there did not exist any contractual relationship between Carney and Dexter. The Appellate Division of the Superior Court of New Jersey appears to have rejected the proposition that there is an implied covenant of good faith and fair dealing between an employer and an employee in an at-will situation. *McQuitty v. General Dynamics Corp., supra,* 204 N.J. Super. 514, 499 A.2d 526. *See also Brunner v. Abex Corp., supra,* 661 F.Supp. at 1356.

■ Carney also claims that Dexter's conduct in terminating him constituted an abusive discharge contrary to the clear mandate of the public policy of the state of New Jersey. *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 72, 417 A.2d 505 (1980), establishes that an at-will employee working without a contract may not be discharged for failing "to perform an act that would require a violation of a clear mandate of public policy." Significantly, however, the Supreme Court emphasized that "unless an employee at-will identifies a specific expression of public policy, he may be discharged with or without cause." *Id.* As the court noted in *Brunner*, Pierce should not be viewed as a back door for gaining more protection than otherwise available to an at-will employee. 661 F.Supp. at 1357. Because Dexter's decision to terminate Carney had nothing to do with his acting pursuant to a clear mandate of public policy, this claim fails as a matter of law.

**6.** Even if certain Dexter employees had given Carney that impression, the oral statement of policy by his superiors is probative only if plaintiff is able to prove at trial that their statements constituted an accurate representation of policy which they were authorized to make. *Shebar, supra,* 218 N.J.Super. at 121, 526 A.2d 1144. It is important to note that there are situations in which sworn testimony can properly be corrected by a subsequent affidavit. Where the witness was confused at the earlier deposition or for some other reason misspoke, the subsequent correcting or clarifying affidavit may be sufficient to create a material dispute of fact. This rule does not apply here, however, where Carney was carefully questioned on the issue, had access to the relevant information at that time, and provided no satisfactory explanation for the apparent—albeit slight—contradiction. Any ambiguity here does not create a *genuine* issue of material fact. *Martin v. Merrill Dow Pharmaceuticals, Inc.,* 851 F.2d 703 (3d Cir.1988).

Finally, Carney claims in Count Six that Dexter's actions constitute intentional infliction of emotional distress. This tort was first recognized in New Jersey as an independent cause of action in *Hume v. Bayer*, 178 N.J.Super. 310, 428 A.2d 966 (Law Div.1981). In *Hume*, the defendant doctor had examined the plaintiffs' son. Although he knew otherwise, the doctor informed the plaintiffs that their son had a potentially cancerous appendix. In determining whether the conduct in that case constituted an intention infliction of distress, the court recognized that:

> In those states where the tort has been recognized it is "generally agreed that the conduct must be so extreme and outrageous" as to go beyond all possible bounds of decency, and be regarded as atrocious and utterly intolerable in a civilized community.

*Id.* at 314, 428 A.2d 966. *See Brunner v. Abex Corp., supra,* 661 F.Supp. at 1359 (discussing the evolution of the tort of intentional infliction of emotional distress and rejecting its applicability in the context of employee discharge case).

In establishing a cause of action for intentional infliction of emotional harm, the court in *Hume* relied on *Prosser, Law of Torts* (4th ed. 1971) for guidance:

> *Prosser* cites a variety of cases from a number of jurisdictions which not only recognize the tort but also provide illuminating examples of the type of conduct considered sufficiently outrageous and extreme to justify recovery. Examples include spreading a false rumor that plaintiff's son had hung himself; bringing a mob to plaintiff's door with a threat to lynch him if he did not leave town; and wrapping up a gory dead rat inside of a loaf of bread for a sensitive person to open.

178 N.J.Super. at 315, 428 A.2d 966, citing to *Prosser,* § 12 at 50.

In this case there is a complete absence of any facts which could be considered "extreme and outrageous" when compared to the foregoing examples. Although Dexter does not appear to have provided any security for Carney, and has not assisted him, at age sixty, in locating another position, its decision to terminate Carney does not rise to the level necessary to state a claim for intentional infliction of emotional harm. Even if Carney, an independent contractor, has in fact suffered certain side effects from the termination, the conduct of Dexter, involving a basis business decision, was not so "extreme and outrageous" in the sense that it could have expected to inflict such emotional harm upon Carney. *See Zamboni v. Stamler,* 847 F.2d 73, 80 (3d Cir.1988).

*Conclusion*

Carney has failed to establish a prima facie case of age discrimination under either ADEA or NJLAD. In addition, his other state law claims fail as a matter of law. Consequently, summary judgment is granted in favor of Dexter on all counts of the Complaint. This action is dismissed with prejudice.