**Gregory Isaac BRODSKY, Ph.D., Plaintiff,**

v.

**HERCULES, INCORPORATED, Defendant.**

Civil Action No. 96–51 MMS.

United States District Court. D. Delaware.

Argued May 1, 1997.

Decided June 17, 1997.

Michael J. Ippoliti, of Becker, Becker & Ippoliti, P.A., Wilmington, DE (Alan B. Epstein of Jablon, Epstein, Wolf & Drucker, Philadelphia, PA, of counsel), for Plaintiff.

Michael P. Kelly of Haase & Kelly, Wilmington, DE (Brent E. Zepke, Hercules Incorporated, Wilmington, DE, Michael J. Connolly of Cross Wrock, P.C., Detroit, MI and Clifford J. Scharman of Cross Wrock, P.C., Washington, DC, of counsel) for Defendant.

## *OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

## I. INTRODUCTION

Plaintiff Gregory Isaac Brodsky ("Brodsky") brought this action against Hercules, Inc. ("Hercules") as a result of his termination from employment in a Reduction in Force Program ("RIF") implemented by Hercules in 1994. In Count I of his complaint, Brodsky alleges violations of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621, *et seq.* In Count II, Brodsky claims Hercules has violated Delaware public policy as embodied in the DLAD. In Count III, he claims that Hercules breached an implied covenant of good faith and fair dealing. Finally, Count IV contains a claim for intentional infliction of emotional distress. Pending before the Court is Hercules' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a). For the reasons below, Hercules' motion will be granted in part and denied in part.

## II. FACTUAL BACKGROUND

### A. From Russia with Resins

Brodsky was hired by Hercules, a manufacturer of chemicals and chemical products, as a Senior Research Chemist in 1981. Docket Item ("D.I.") 30 at 58. Brodsky, who was fifty years old at the time, had a wealth of experience in the chemical field; he received his doctorate at the Institute of Fine Chemical Technology and worked for twenty-two years at the Tire Research Institute, both of Moscow, the heart of the then-Soviet Union. D.I. 30 at 12. On his application with Hercules, Brodsky indicated a job as a rubber chemist as his first choice, while a position in polymer material engineering as his second choice. D.I. 30 at 15, 58.

Hercules placed Brodsky in its "Resins Research & Development" group. D.I. 30 at 18. The Resins Research group was partitioned into discrete units referred to as "Labs"; the two relevant units for our purposes were the "Rubber Lab" and "Polymer Fractionation Lab." Brodsky was assigned to the Rubber Lab, where he worked until 1986. D.I. 30 at 21. In the Rubber Lab, Brodsky worked primarily with resins in rubber and tires. D.I. 30 at 19.

Brodsky's work in the Rubber Lab was praised by his supervisor and others who evaluated his work. For example, Brodsky's supervisor, R. William Brody, enthused in 1982 that "[t]he addition of Gregory [Brodsky] to our Rubber Lab has greatly enhanced our capabilities. The expertise he

has brought with him cannot be attained by a new man from a University. It can only be learned on the job. He is a valuable asset." D.I. 35 at 31. In 1983, Brody lauded Brodsky's "excellent knowledge of basic polymer physics and his ability to relate those basics to practical problems." D.I. 35 at 33. Brody went on to add "Gregory [Brodsky] is looked up to by everyone in the laboratory and is consulted on most programs[,]" *id.*, and noted Brodsky's desire to "remain in the area of Rubber R & D [shorthand for research and development] and to advance on the technical ladder[,]" D.I. 35 at 34. In 1985, Brodsky was cited for developing an adhesive system with potential for uses with products other than rubber, such as polyester and fiberglass. D.I. 35 at 38.

In 1986, Brodsky was transferred from the Rubber Lab to the Polymer Fractionation Lab. For approximately the next eighteen months, Brodsky was engaged in the polymer fractionation of plastic resins, a field which, as Brodsky puts it, has "[n]othing to do with rubber." D.I. 30 at 20. A 1987 review of Brodsky's performance reveals that, as he did in the Rubber Lab, Brodsky proved capable in polymer fractionation. Daniel Monagle, the Division Manager wrote:

> Gregory has made a *smooth transition* from Rubber group to our polymer fractionation programs—for which we are very appreciative. He is a hard worker—more of a polymer scientist than an analytical chemist. *Making valuable contributions to [two different Hercules programs]. More recently has become involved in Kymene/polyelectrolyte fractionation.* His approach is indeed that of a mature scientist in that he studies—reads up on literature—gets a good understanding of what's needed and then proceeds in a logical—calculated manner. A valuable Hercules employee....

D.I. 35 at 47 (emphasis added).

After his approximately eighteen-month stint in the Polymer Fractionation Lab, Brodsky returned, at the invitation of a divisional manager and a former supervisor, to the Rubber Lab. D.I. 30 at 20. Brodsky was needed in the Rubber Lab to work on a major tire research project—the so-called "Inner Liner" project. D.I. 30 at 21. While working on the Inner Liner project, Brodsky, along with two other Hercules scientists, developed a patent for a tire innerliner. D.I. 30 at 60. Brodsky again earned rave reviews for his work in the Rubber Lab in 1989—his division manager labeled him a "top producer," D.I. 35 at 53—and was deemed "promotable" to a position as Research Scientist within one year. By 1991, however, Brodsky had still not been promoted, despite earning satisfactory performance reviews and eliciting a comment by the manager of the resins division that Brodsky "is ready to be promoted because he is an expert in rubber and tires." D.I. 30 at 57.

**B. The Reduction in Force ("RIF") Process**

As Hercules moved into the 1990s, it instituted a series of reductions in force ("RIF"s). Employees in the Wilmington Research Laboratory were slashed from a robust 1,000 before 1990 to close to 400 in 1996. D.I. 30 at 86. Worldwide, Hercules retained only 30% of its former employees. D.I. 30 at 37.

To administer the RIF, Hercules developed a written policy. D.I. 30 at 107–111. With an eye toward "retention of the best workforce," Hercules identified the following "*criteria for selection* of those individuals to be displaced, ... in this order of priority:

"a. Job performance;

"b. Prior experience, including the individual's versatility and flexibility in terms of known and demonstrated performance on other functional responsibilities;

"c. Education applicable to the job;

"d. Relative ability;

"e. Physical limitations to performing a function other than that on which currently assigned (supported by medical documentation);

"f. Adjusted service date/then continuous service;

*if all of the above are equal*—

"g. Date of Birth (retention preference shall be granted to the senior aged employee)."

D.I. 30 at 108. In addition, Brodsky's supervisor in 1994, Peter M. Dunckley, explained he was not to consider age or "potential" in selecting individuals to be "displaced"; rather, he "should evaluate the job on its merits." D.I. 30 at 137.

### C. The 1991 RIF

As a result of the RIF process in 1991, ten out of the twenty-two non-hourly employees in the Resins Research & Development group were either discharged or took early retirement. D.I. 30 at 222, 286–87. Out of the eight scientists working in the Rubber Lab, only four remained after the 1991 RIF. D.I. 30 at 259, 265. Of the twelve individuals who survived the 1991 RIF, six were either forty-seven years of age or older. D.I. 30 at 222. Brodsky had originally been slated for termination as part of the 1991 RIF, but was spared because his extensive background in rubber and tires made him particularly valuable for the Inner Liner project and another rubber project that was looming on the horizon—the Uniroyal project. D.I. 30 at 69, 222.

### D. Dr. Napolitano Joins the Rubber Lab

In approximately 1990 or 1991, Dr. Michael Napolitano ("Napolitano"), a twenty-nine year old chemist, was transferred into the Rubber Lab from his work with hot-melt adhesives and tackifiers.[1] D.I. 30 at 423–24. Napolitano, Brodsky alleges, was accorded far different treatment than Brodsky; while Hercules viewed Napolitano as an up-and-comer with tremendous potential and took affirmative steps to broaden his areas of expertise, Brodsky was seen as having one foot in the retirement grave, and was continually denied opportunities to work with products other than rubber. As support for this allegation, Brodsky points to statements made by Dunckley, who supervised both Brodsky and Napolitano. Referring to Napolitano, Dunckley wrote, "We need to further broaden his experience by using him on projects from different [units]. We need to start development of management skills." D.I. 35 at 70.

### E. The 1994 RIF

Hercules instituted a second RIF in early 1994. The staff in the Rubber Lab was again targeted, and this time, Brodsky was selected for termination. Brodsky declined an offer of early retirement and Hercules rejected his proposal that he be permitted to work another approximately one-and-a-half years until he became eligible for retirement. D.I. 30 at 52–53. About two weeks later Brodsky was formally informed he had been terminated. D.I. 30 at 51–52. According to Brodsky, his supervisor abruptly told him he was terminated and gave him three hours to collect his belongings and leave. D.I. 30 at 254.

Brodsky's supervisor gave three reasons Brodsky was cashiered: (1) his experience and expertise were concentrated in rubber products, thus making him less versatile and flexible than other employees in the Resins Group; (2) he had been outperformed by other employees in the Resins Group; and (3) the two rubber research projects which had spared his job in 1991—the Uniroyal and Innerliner Projects—were now completed and no new major rubber projects were foreseeable. D.I. 30 at 69–70.

At first, Brodsky fingered two scientists whom he felt should have been terminated before him. The first, Jay Class, is older than Brodsky, and did not take on any of the responsibilities Brodsky had in the Rubber Lab. In fact, as Dunckley testified, nobody in Hercules had taken on any of Brodsky's responsibilities after he was terminated because the Inner Liner and Uniroyal Projects had "stopped completely." D.I. 30 at 153.[2]

The second, Napolitano, was thirty-three at the time of the 1994 RIF. Hercules offers two reasons Napolitano was retained while Brodsky was cashiered. First, Hercules

---

**1.** Tackifiers are "materials that are added to polymers to give tack or adhesion[.] ..." D.I. 30 at 424–25.

**2.** Perhaps realizing the comparison to Dr. Class did not flatter his claim, Brodsky no longer focuses on Dr. Class; he seems to have dropped the contention that Dr. Class should have been terminated before he was.

notes, although Napolitano remained in the Rubber Lab after the 1994 RIF, he did not work with rubber; indeed, Napolitano had not worked with rubber since 1992. D.I. 30 at 438. The majority of his work was on applications in cross-linking of polyethylene, a plastic, and its applications with wires and cables. D.I. 30 at 439. As Napolitano put it, "[o]ther than [being] physically located in that facility [the Rubber Lab], I really did. not interact with the rubber side of the business." *Id.* Napolitano was not hamstrung as was Brodsky when the Inner Liner and Uniroyal projects ceased, Hercules concludes; Napolitano's expertise outside of rubber matched the type of work that was still available.

Hercules points to an additional, albeit related, reason for keeping Napolitano: according to Hercules, he was a more capable and versatile employee than Brodsky. As support for this, Hercules argues Napolitano received better performance reviews than Brodsky.[3] Further, Hercules stresses that Napolitano was a "polymer engineer," while Brodsky was a mere "polymer chemist." According to Hercules, polymer engineers have a stronger focus than polymer chemists on the application of the principles of polymer chemistry, D.I. 30 at 417; Napolitano's background in applications made him more valuable when Hercules was deciding how to reduce its staff most efficiently.

### F. The Aftermath of the 1994 RIF

Both preceding and following the 1994 RIF, Brodsky pursued job opportunities by applying for positions with twenty-seven different companies. D.I. 30 at 250–53. Twenty-six of those positions were for a "Freelance Technical Translator." When Brodsky looked for a Freelance Technical Translator position before the 1994 RIF, he was merely

seeking "[j]ust to have extra money...." D.I. 30 at 43. Brodsky now works as a consultant in Rubber and Plastic with Decision Resources, Inc. of Waltham, Massachusetts. D.I. 30 at 253. It is undisputed Brodsky has not sought a position as a research scientist; as Brodsky puts it, he perceived the "market for older chemical scientists [as] very limited, making it difficult for a mature scientist of 63 years to find a position as a research scientist."

In addition to looking for new work, Brodsky filed a charge of discrimination with the Delaware Department of Labor ("DDOL") and with the Equal Employment Opportunity Commission ("EEOC"), alleging Hercules discriminated against him on the basis of his age and religion by terminating him in the 1994 RIF and failing to promote him before 1994. The DDOL issued an Investigative Memorandum concluding Hercules had not followed its RIF policy and finding reasonable cause to believe Hercules had engaged in unlawful age discrimination. D.I. 35 at 89–96.[4] Brodsky, of course, filed suit in this Court. Hercules moved for summary judgment on each of Brodsky's claims, which will be examined below.

### III. DISCUSSION

#### A. Summary Judgment

Hercules has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Rule 56 commands the Court to enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

---

**3.** In its brief Hercules alleges Napolitano was rated as "outstanding" in six categories in a 1993 year-end performance review, while Brodsky earned an "outstanding" mark in only three categories. D.I. 29 at 14. Napolitano's 1993 year-end performance review is not in the record, however. Napolitano's 1994 year-end performance review is in the record; he earned three "outstandings," four "targets," and two "basics." D.I. 30 at Tab 21. Brodsky was terminated in 1994, of course, so he would not have a 1994 year-end performance review. In his 1993

year-end performance review, Brodsky earned three "outstandings" and six "basics." D.I. 30 at 61.

**4.** The DDOL found the evidence was "not strong enough to either prove or disprove" the allegation Hercules had discriminated against Brodsky because of his religion. D.I. 35 at 96. Brodsky has not pursued in this Court his claim of discrimination on the basis of religion.

judgment as a matter of law." FED. R. CIV. P. 56(c).

For Hercules to obtain summary judgment, it must show Brodsky "will be unable to introduce either direct evidence of a purpose to discriminate or indirect evidence by showing that the proffered reason [Brodsky was terminated or not promoted] is subject to factual dispute." *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir.1987). This Court is guided by the maxim that "at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In sum, when reviewing this motion for summary judgment by Hercules, this Court (1) resolves conflicting evidence in favor of plaintiff, (2) does not engage in credibility determinations, and (3) draws all reasonable inferences in favor of plaintiff. *See Bray v. Marriott Hotels,* 110 F.3d 986, 989 (3d Cir.1997); *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir.1996) (in banc), *cert. denied,* ─── U.S. ───, 117 S.Ct. 2532, ─── L.Ed.2d ─── (1997); *Fuentes v. Perskie,* 32 F.3d 759, 762 (3d Cir.1994). Finally, this Court is mindful these standards are "applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Robinson v. PPG Indus., Inc.*, 23 F.3d 1159, 1162 (7th Cir.1994).

### B. Brodsky's ADEA Claims

#### 1. Analytical Framework

The Age Discrimination in Employment Act makes it unlawful to "discharge any individual [over the age of forty] or otherwise discriminate against any individual [over the age of forty] with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Brodsky has alleged Hercules has violated the ADEA in two different respects: (1) by terminating him as part of the 1994 RIF; and (2) by failing to promote him.

As with other employment discrimination claims, ADEA claims can be established in either, or both, of two ways: (1) by presentation of direct evidence Hercules harbored discriminatory animus under *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or (2) from evidence which creates an inference of discrimination under the burden-shifting framework of the *McDonnell Douglas/Burdine/Hicks* trilogy and its progeny. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Brodsky does not allege he has presented direct evidence Hercules harbored discriminatory animus. Therefore, the Court analyzes his claims under the burden-shifting framework of *McDonnell Douglas/Burdine/Hicks.*[5]

The *McDonnell Douglas/Burdine/Hicks* troika initially requires the plaintiff to establish by a preponderance of the evidence a prima facie case of disparate treatment. *Burdine,* 450 U.S. at 252, 101 S.Ct. at 1093. The requirements of a prima facie case are "not onerous," *Burdine,* 450 U.S. at 253, 101

---

**5.** The Court applies the burden-shifting framework with a sympathetic nod to the views of Circuit Judge Greenberg, who in a concurring opinion in *Miller v. CIGNA Corp.*, 47 F.3d 586, 599 (3d Cir.1995) (in banc), advocated sweeping the brittle husks of these analytical frameworks into the dustbin of legal history. He wrote:

> [T]he area of employment discrimination law is cursed with elusive terms like "mixed motives" and "pretext," and with numerous presumptions, inferences and burden-shifting rules. Those terms and rules historically often have taken on lives of their own, independent

of their connection to the underlying theories of liability that gave them birth. Thus, a "mixed motives" case is not about mixed motives, and a "pretext" case has little to do with pretext. I believe the time has come to clarify the current status of theories of ADEA liability, and to dispense with unhelpful monikers whenever possible. Thus, unlike the in banc majority, I would dispense altogether with the terms "pretext" and "mixed motives" and hold explicitly that the same standard applies to all disparate treatment cases.

S.Ct. at 1093–94,[6] and will necessarily depend on the circumstances of the case. *Bray,* 110 F.3d at 990 n. 5; *Marzano v. Computer Science Corp.,* 91 F.3d 497, 503 (3d Cir.1996); *Torre v. Casio, Inc.,* 42 F.3d 825, 830 (3d Cir.1994); *see also McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13 (noting that elements of prima facie case may vary depending on facts); *Roebuck v. Drexel Univ.,* 852 F.2d 715, 726 (3d Cir.1988) (adjusting prima facie elements in case involving denial of tenure); *Jackson v. United States Steel Corp.,* 624 F.2d 436, 440 (3d Cir.1980) (stating that elements of prima facie case as announced in *McDonnell Douglas* need not be present in every case).

For example, in a RIF case, a plaintiff must show the following to establish a prima facie case: (a) he belongs to a protected class; (b) he was qualified for the position; (c) he was dismissed despite being qualified; and (d) he was discharged, while the employer retained someone similarly situated outside the protected class.[7] *Marzano,* 91 F.3d at 503; *DiBiase v. SmithKline Beecham Corp.,* 48 F.3d 719, 723 n. 2 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995); *Torre,* 42 F.3d at 831.

In a failure to promote claim under the ADEA, while the ultimate inquiry for the prima face case is the same—to wit, whether the defendant has discriminated—the requirements are slightly different. A plaintiff must demonstrate: (a) he belongs to a protected category; (b) he applied and was qualified for a promotion; (c) despite his qualifications, he was denied the promotion; and (d) other employees of similar qualifications who were not members of the protected group were promoted at the time the plaintiff's request for promotion was denied. *United States Postal Serv. Bd. of Governors v. Aikens,* 453 U.S. 902, 903 n. 1, 101 S.Ct. 3135, 3136 n. 1, 69 L.Ed.2d 989 (1981) (Marshall, J., dissenting); *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Bray,* 110 F.3d at 990 n. 5; *Molthan v. Temple Univ.,* 778 F.2d 955, 961 (3d Cir.1985); *Lewis v. State of Delaware,* 948 F.Supp. 352, 358–59 (D.Del.1996); *Revis v. Slocomb Indus., Inc.,* 814 F.Supp. 1209, 1217 (D.Del.1993).

Once plaintiff succeeds in presenting a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the unfavorable treatment. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Fuentes v. Perskie,* 32 F.3d at 763. This burden is not heavy; in fact, it has been disparaged as "so light as to be trivial." Deborah C. Malamud, *The Last Minuet: Disparate Treatment After Hicks,* 93 Mich. L. Rev. 2229, 2302 (1995). After the defendant produces a legitimate, nondiscriminatory reason, the plaintiff can defeat summary judgment by pointing to some direct or circumstantial evidence from which a fact finder could reasonably either: "(1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action." *Sheridan,* 100 F.3d at 1067 (quoting *Fuentes,* 32 F.3d at 764); *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 523 (3d Cir.1992), *cert. denied,* 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993).

**6.** The prima facie showing, while "not onerous," still serves a purpose; it "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1094. As the Court elaborated in *Furnco Construction Corp. v. Waters:*

[W]e are willing to presume this [discrimination] largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race.

438 U.S. 567, 577, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978).

**7.** Hercules insists Brodsky must show he was replaced by someone under the age of forty to establish a prima facie case in a RIF case. D.I. 29 at 17–22. This position has been continuously and emphatically rejected by the Third Circuit Court of Appeals for obvious reasons; when a reduction-in-force is implemented, there are no replacements, only departures. *Marzano,* 91 F.3d at 503; *Massarsky v. General Motors Corp.,* 706 F.2d 111, 118 n. 13 (3d Cir.1983).

Thus, if he can sufficiently discredit the employer's articulated reason, the employee need not come forward with additional evidence of discrimination beyond the prima facie case. *Sheridan,* 100 F.3d at 1071; *Fuentes,* 32 F.3d at 764. Rather, a plaintiff can avoid summary judgment by producing evidence that would allow a fact finder reasonably to infer that "each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes,* 32 F.3d at 764.[8]

The ultimate focus, it must be remembered, is on whether the employer has discriminated against a member of a protected class. Or, put another way, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *Marzano,* 91 F.3d at 503. Accordingly, an employee cannot avoid summary judgment by showing the employer acted improvidently. Like Title VII, the ADEA does not command employers to be shrewd or wise or efficient; an employer is free to ruin his business with witless practices, so long as those practices are not motivated by discriminatory animus. Rather, a plaintiff must cast "substantial doubt" upon the proffered legitimate reason by demonstrating "such weaknesses or implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them 'unworthy of credence[.]'" *Fuentes,* 32 F.3d at 765 (quoting *Ezold,* 983 F.2d at 531). *See also Sheridan,* 100 F.3d at 1071 (endorsing *Fuentes* ). While this standard may place a difficult burden on plaintiffs, "[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs." *Fuentes,* 32 F.3d at 765 (quoting *Ezold,* 983 F.2d at 531).

If a plaintiff cannot cast substantial doubt on the defendant's proffered reason, he can still avoid summary judgment by producing sufficient evidence that would allow a fact finder reasonably to infer the employer was motivated by discriminatory animus. *Id.* Such evidence could consist of showing the employer has discriminated against plaintiff or a protected class in the past. *Id.*

Finally, both the Supreme Court and Third Circuit Court of Appeals have warned that slavish adherence to the shifting burden analysis can be sheer folly. As the Court of Appeals has explained, "[t]he ultimate question remains whether the defendant has discriminated. The presumption and shifting burdens are merely an aid—not ends in themselves." *Goodman v. Lukens Steel Co.,* 777 F.2d 113, 130 (3d Cir.1985), *aff'd* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *see also Lewis,* 948 F.Supp. at 357–59; *Paul v. F.W. Woolworth Co.,* 809 F.Supp. 1155, 1159 (D.Del.1992).

Specifically, the Court of Appeals has warned with regard to the establishment of a prima facie case:

> [C]ourts need not, and should not, stubbornly analyze all Title VII factual scenarios through the *McDonnell Douglas* formula. Instead, courts must be sensitive to the myriad of ways such an inference [of discrimination] can be created. Simply stated, a Title VII plaintiff has established a prima facie case when sufficient evidence is offered such that the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons.

*EEOC v. Metal Serv. Co.,* 892 F.2d 341, 348 (3d Cir.1990) (citations omitted). With these standards in mind, the Court turns to the merits of Brodsky's claim when viewed through the procedural prism of summary judgment.

### 2. Brodsky's RIF Claim
#### (a) Prima Facie Case

■ There is no question Brodsky has established the first three elements of a prima

---

8. This is because, under *Hicks,* the fact finder's rejection of the employer's proffered legitimate reason permits, but does not compel, a finding of unlawful discrimination from the prima facie case. *See* 509 U.S. at 511, 113 S.Ct. at 2749; *Sheridan,* 100 F.3d 1061, 1066–67.

facie case for discriminatory discharge in the 1994 RIF.[9] The parties quarrel seems to center on whether Brodsky has established the final prong of the prima facie case; in other words, whether Brodsky has shown he was cashiered while Hercules retained someone similarly situated but younger than forty years of age.[10]

Hercules argues that Brodsky and Napolitano, the employee who was retained, were not similarly situated, and further, the only employee who was both similarly situated to Brodsky *and* retained was Class, who is older than Brodsky. Therefore, argues Hercules, Brodsky's prima facie case fails.

Hercules highlights five fundamental differences between Napolitano and Brodsky to reinforce its argument the two employees were not similarly situated. First, Napolitano is a Polymer Engineer, D.I. 30 at 416–18, while Brodsky's specialty was as a Rubber Chemist, D.I. 30 at 15, 26–27. Second, Napolitano had a doctorate degree in "Polymer Science and Engineering," and did his graduate work in adhesion and polymer modification, D.I. 30 at 414–15, 425, but Brodsky received his doctorate in chemical technology and worked as a chemist before arriving at Hercules, D.I. 30 at 12–14. According to Napolitano, these are more than semantic quibbles; polymer chemists merely study the "synthesis of long chain molecules," but polymer engineers apply and use those chains. D.I. 30 at 415, 417. Third, Napolitano's expertise was by his account in resins and "chewing gum" with an emphasis on customer interaction. D.I. 30 at 418, 435, 438. Brodsky, on the other hand, was considered primarily a rubber specialist, although he asserts he was also known as a specialist in polymer fractionation. D.I. 30 at 26–27. Fourth, Napolitano worked in cross-linking and applications of polyethylene in wire and cable, D.I. 30 at 418, and Brodsky's two major projects were the Inner Liner and Uniroyal projects, D.I. 30 at 20–25. Fifth,

Napolitano worked in the hot-melt adhesives program, D.I. 30 at 418–19; in contrast, Brodsky admits he never worked in hot-melt adhesives, D.I. 30 at 260, 266.

There are indeed distinctions between Brodsky and Napolitano in their education, training, experience, expertise, and job duties. Those distinctions are not so striking, however, to compel the conclusion that Brodsky and Napolitano were not similarly situated for purposes of determining whether Brodsky has established a prima facie case. The Court is mindful of the procedural stage under which this comparison is undertaken; although Brodsky bears the burden of proving by a preponderance of evidence each element of his prima facie case, *See Burdine,* 450 U.S. at 252, 101 S.Ct. at 1093, all reasonable inferences from the factual record must be drawn in favor of Brodsky in opposing summary judgment. *Marzano,* 91 F.3d at 501. When the record is examined in its entirety, there is sufficient evidence to conclude Brodsky and Napolitano were similarly situated prior to the 1994 RIF.

Quite simply, Napolitano and Brodsky were similarly situated because both were candidates for termination in the 1994 RIF and were subject to the same scrutiny. In other words, Napolitano and Brodsky were two of the seven employees eligible for displacement in the Resins Group; Hercules admits the same supervisor, Ken Steller compared Napolitano and Brodsky before the 1994 RIF, and selected Brodsky for termination. *See* D.I. 30 at 223; D.I. 35 at 75–78, 80. In essence, then, Brodsky and Napolitano were in direct competition for retention of their jobs.

At this procedural stage, Brodsky has established a prima facie case of disparate treatment. Hercules emphasizes how the qualifications of Napolitano and Brodsky diverge, but this argument is more suited for the next stage of the *McDonnell Douglas/Burdine/Hicks* analytical framework—the

---

**9.** That is, (1) he belonged to a protected group; i.e., workers over the age of forty; (2) he was qualified; and (3) he was dismissed despite being qualified.

**10.** The Court writes that the dispute "seems to center on the final prong" because Hercules ar-

gues Brodsky must show he was "replaced" in order to establish a prima facie case. While this is not the law, *see Marzano,* 91 F.3d at 503, Hercules' broader point is the one replicated in the text of this opinion.

production of a legitimate, nondiscriminatory reason.

*(b) Legitimate, Nondiscriminatory Reason*

Brodsky has established a prima facie case of disparate treatment in the 1994 RIF. Accordingly, Hercules bears the burden of producing a nondiscriminatory reason for its termination of Brodsky. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Fuentes v. Perskie,* 32 F.3d at 763. According to Hercules, Brodsky lost his job because: (1) the two major rubber projects (Inner Liner and Uniroyal) were completed and Hercules anticipated there would be no further substantial rubber projects for a rubber specialist like Brodsky to work on; (2) Brodsky was not versatile; and (3) his job performance was not as strong as the other candidates. All of these reasons are legitimate.

*(c) Pretext*

■ Brodsky can survive summary judgment either by casting substantial doubt on the reasons offered by Hercules or by other evidence of discriminatory animus. As for the first two reasons posited by Hercules—that Brodsky was a rubber specialist in a company with no rubber work and was not versatile—Brodsky has introduced evidence that while his expertise was in rubber, he was experienced and qualified in areas other than rubber.

For example, although his "accountability commitments" [11] in 1994 included the Uniroyal project, which apparently became defunct after the 1994 RIF, Brodsky was also charged with providing "technical support on applications for our peroxy chemicals in polymer systems as identified as additional sales opportunities by marketing[ ]" and "collect[ing] data on properties of special polymers." D.I. 30 at 64–66. [12] These responsibilities were similar to those assigned to Napolitano, who was to "[m]aintain market share and improve productivity costs" with regard to peroxy chemicals, and was to "[g]ain market penetration to provide growth avenues especially for HC resins" in the area of "Rubber & Plastics Modification." D.I. 30 at Tab 21. Brodsky notes Napolitano did not move to the adhesives department—an area in which Brodsky admittedly had no experience—until another scientist, Fan Gu, resigned and after Brodsky had already left in the 1994 RIF. *See* D.I. 30 at Tab 12.

Further, Brodsky testified only fifty percent of his work was on the Inner Liner program; the other half of his work consisted of research concerning "polymer system[s], cross mixed, cross link system[s] for polymers like sulfur and peroxide systems." D.I. 30 at 26. This is significant, argues Brodsky, because the adhesives department, to which Napolitano was transferred after the 1994 RIF, also works with plastics and cross-linkers.

Still further, when Brodsky was transferred out of the Rubber Lab into the Fractionation Lab for approximately eighteen months from 1986 to 1988, he received praise for the "smooth transition" and his "level of creativity." D.I. 35 at 47. Despite these strides, Brodsky alleges, Hercules earmarked the diverse projects for Napolitano, a younger scientist, and decided it would be easier to limit Brodsky to rubber than "waste" resources in training and equipping an older scientist. In support of this assertion, Brodsky points to a 1992 evaluation of eight employees in the Resins Department. D.I. 35 at 97. Five of those employees was over the age of forty, and four, including the two who were over the age of sixty, were rated as having a "poor" potential. D.I. 35 at 97–98. The three employees under the age of forty were rated as having either "good" or "high" potential. *Id.* Brodsky, who was sixty-one at the time, was described as "inflexible," and Class, who was sixty-four, was described as "stuck in the past." D.I. 35 at 97. Had he been given the chance to work with products other than rubber instead of being viewed as "inflexible" because of his age, Brodsky alleges, he, instead of Napolita-

---

11. Accountability commitments serve to describe the assignments and responsibilities a particular employee will have for the upcoming year.

12. Further, it is not entirely clear Hercules knew prior to the 1994 RIF the Uniroyal project would expire in the near future. If Hercules did not know this, Hercules' ignorance bolsters Brodsky's claim of age discrimination.

no, would have been in a position to survive the 1994 RIF.[13]

Finally, Brodsky points to evidence that Hercules' rubber sales, measured in dollar value, actually increased since 1994. D.I. 30 at 142–43. This would seem to undermine the assertion Brodsky was terminated because customer interest in rubber had dwindled.

As for Hercules' third legitimate reason—that Brodsky's level of performance was not as high as the other scientists in the Resins Group, particularly Napolitano, Brodsky points to his almost uniformly laudatory performance reviews. In fact, in the most recent reviews submitted to this Court, Brodsky's performance was rated at least as high as Napolitano's. See D.I. 30 at 61, Tab 21.

### (d) Conclusion

At argument and in briefing, Hercules explored the weaknesses in the underpinnings of Brodsky's claim of age discrimination. Indeed, Brodsky's expertise was admittedly in rubber; Napolitano, on the other hand, spent more of his time in the application of resins and, perhaps most importantly in the hurly-burly world that results from an amalgamation of commerce and science, in customer service. At trial, Hercules' explanation for Brodsky's termination may very well prevail.

But summary judgment is not trial; the Court cannot weigh conflicting evidence and draw conclusions about credibility at summary judgment. The Third Circuit Court of Appeals has admonished the district courts not to be overly tempted by weaknesses in each segment of evidence when viewed in isolation. Comparing the litigation of employment discrimination claims to a cohesive performance, the appellate court has written: "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." Bray, 110 F.3d at 991 (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir.1990)).

Looking at all of the evidence in a light most favorable to Brodsky, and drawing all reasonable inferences in his favor, the evidence at this procedural phase demonstrates Brodsky could choreograph a tragedy at trial. A reasonable factfinder could find Hercules violated the ADEA by terminating Brodsky in the 1994 RIF because it had decided it would rather invest time and money in training Napolitano, a younger employee. While "the inference of age discrimination may not be overpowering, [the Court] cannot say that as a matter of law, it is insufficient." Torre, 42 F.3d at 831–32. Accordingly, Hercules' motion for summary judgment on Brodsky's claim of discriminatory termination will be denied.

### 3. Brodsky's Failure to Promote Claim

■ As discussed earlier, Brodsky can establish a prima facie claim of discriminatory failure to promote by demonstrating: (a) he belongs to a protected category; (b) he applied and was qualified for a promotion; (c) despite his qualifications, he was denied the promotion; and (d) other employees of similar qualifications who were not members of the protected group were promoted at the time the plaintiff's request for promotion was denied.

Promotions at Hercules were decided on the basis of performance, versatility, length of service, originality, efficiency, and interaction with other chemists. D.I. 30 at 172. If an individual showed sufficient promise in these categories, his immediate supervisor would recommend him for a promotion. D.I. 30 at 173. This recommendation would then be reviewed by the director of the lab; if the director approved the recommendation, the promotion would be granted. D.I. 30 at 173. Hercules concedes employees were promoted without regard to the performance of other employees; in other words, there were no limited number of promotion slots for which employees would be in direct competition.

This last point becomes important, because Brodsky has plainly fulfilled the first three of the four elements of a prima facie case. He

13. Hercules employees who implemented the RIF were explicitly told not to consider "potential." D.I. 30 at 137. The Court expresses no view on the argument, heretofore unaddressed by the parties, that "inflexibility" can be equated with "potential."

was over forty years of age, he was clearly qualified for a promotion—indeed, he was recommended for a promotion on two separate occasions, *see* D.I. 35 at 53, 57—and he never received one. Finally, between May of 1992 and May of 1994, Hercules promoted twenty-five employees from Senior Research Chemist (Brodsky's position) to Research Scientist. Twenty-three of those twenty-five had fewer years of service than Brodsky, and only one of those twenty-five was over the age of fifty. D.I. 35 at 99. Hercules argues Brodsky cannot state a prima facie case because he cannot show he was at least as qualified as those promoted. *Evans v. Technologies App. & Serv. Co.*, 80 F.3d 954, 960 (4th Cir.1996). But where employees are promoted without regard for the qualifications of other employees this requirement becomes meaningless; the employee must show only that he was qualified for a promotion and persons outside the protected group were promoted. Brodsky has done that here.

█ Hercules has countered with the identical reasons for not promoting Brodsky as it has offered for his termination in the 1994 RIF. Brodsky has adduced the same evidence in attempting to cast substantial doubt upon those reasons. The analysis here dovetails with the analysis in sections III.B.2.(c) & (d) of this opinion. Hercules' motion for summary judgment on Brodsky's discriminatory failure to promote claim will be denied.

## C. Mitigation of Damages

█ Hercules argues that Brodsky has essentially "withdrawn from the employment market," D.I. 29 at 35 (citing *Konstantopoulos v. Westvaco Corp.*, 893 F.Supp. 1263, 1279 (D.Del.1994)), and thus should be precluded from a reward of economic damages. A plaintiff has the duty to mitigate damages under the ADEA by seeking comparable employment. *Blum v. Witco Chem. Corp.*, 829 F.2d 367, 374 (3d Cir.1987). The employer, however, has the burden of proving failure to mitigate. *Booker, III v. Taylor Milk Co.*, 64 F.3d 860, 864 (3d Cir.1995) (applying Title VII); *Cantrell v. Knoxville Community Dev.*

*Corp.*, 60 F.3d 1177, 1180 (6th Cir.1995) (applying ADEA); *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 489 n. 8 (4th Cir.1982) (applying ADEA).

To meet this burden, an employer must show two things: (1) substantially equivalent work was available, and (2) the claimant did not exercise reasonable diligence to obtain employment. *Booker*, 64 F.3d at 864. The Third Circuit Court of Appeals stated in *Booker, III v. Taylor Milk Co.*, 64 F.3d at 864, that "whether an employee has met his duty to mitigate damages is a determination of fact." *Id.* The *Booker* court elaborated by stating:

> The reasonableness of a[n] [employment discrimination] claimant's diligence should be evaluated in light of the individual characteristics of the claimant and the job market.... Generally, a plaintiff may satisfy the 'reasonable diligence' requirement by demonstrating a continuing commitment to be a member of the work force and by remaining ready, willing, and available to accept employment.

*Id.* at 865. At this procedural stage, therefore, Hercules must demonstrate there is incontrovertible evidence that Brodsky withdrew from the work force and was unwilling to accept substantially equivalent employment.

Hercules has attached a report from the Center for Forensic Economic Studies, which scrutinizes "economics and labor market dynamics." D.I. 30 at 271–344. The report indicates there were over ninety job opportunities for chemists advertised in one relevant trade journal, the *Chemical and Engineering News*, in the seventeen months following Brodsky's layoff from Hercules. D.I. 38 at Exhibit ("Exh.") 3, ¶ 4. Although the most appropriate market for research chemists is a national market, D.I. 30 at 50, there was no apparent shortage of positions available relatively close to Brodsky's home; twenty-one of those jobs were available in the Mid-Atlantic region.[14]

Yet Brodsky did not apply for a position as a research chemist. He sent out twenty-

---

14. For this purpose, the Mid–Atlantic region consists of Delaware, Maryland, New Jersey, Pennsylvania, and the District of Columbia. Brodsky calls New Jersey home.

seven resumes, and placed an advertisement in the Chemical and Engineering News—all but one resume were for positions as a technical translator. D.I. 30 at 250–53; D.I. 35 at 100. Work as a technical translator is not substantially equivalent to work as a research scientist, argues Hercules. To illustrate this point, Hercules notes Brodsky had been "moonlighting" as a translator since 1983 for supplemental income. D.I. 30 at 42–43. His search for work after his layoff, Hercules concludes, was simply a continuation of what he had always done on a part-time basis—translation for spare cash. Brodsky now works as a consultant in rubber and plastic for a firm in Waltham, Massachusetts.

Hercules compares Brodsky's efforts to the efforts of the plaintiff in *Booker*. In *Booker*, the Third Circuit Court of Appeals held that a plaintiff whose job search for comparable employment consisted of scanning the help-wanted ads of the Sunday New York Times and who earned approximately $23,000 a year doing "odd jobs" was not reasonably diligent in attempting to mitigate his damages. *Booker*, 64 F.3d at 865. Like the plaintiff in *Booker*, Hercules argues, Brodsky's attempt to seek part-time work as a technical translator fails to demonstrate his "continuing commitment to be a member of the work force." *Id.*

The incomplete record in this case prevents entry of summary judgment, however. For example, Hercules has failed to specify how many of the ninety job opportunities for chemists were available to sixty-three year-old chemists with a primary expertise in rubber. Further, there is no indication on the record Brodsky would have made substantially less as a technical translator, or whether Brodsky makes substantially less in the position he now holds—a consultant in rubber or plastic. Since Hercules bears the burden of proof on this fact-intensive issue of reasonableness, this omission is fatal to its motion for summary judgment.

Finally, the *Booker* court recognized "that amounts that could have been earned with reasonable diligence should be used to reduce or decrease a back pay award, not to wholly cut off the right to any back pay." *Id.* at 866. Accordingly, even if the Court concluded Brodsky failed to mitigate his damages through the use or reasonable diligence, Brodsky might still have a viable claim for economic damages, depending upon the facts adduced at trial. This only further serves to compel the conclusion that summary judgment is inappropriate on Brodsky's claim for economic damages as to Brodsky's ADEA claims.

## D. Brodsky's Delaware Public Policy Claim

In Count II of his complaint, Brodsky alleges Hercules "wrongfully terminated [him] in violation of the public policy of the State of Delaware as embodied in the Delaware Law Against Discrimination," DEL. CODE ANN. tit. 19, § 710–718 (1996), "in that it discriminated against [him], on account of his age." D.I. 1 at ¶ 37. In *Finch v. Hercules*, 809 F.Supp. 309, 311 (D.Del.1992), this Court treated such language as potentially alleging one of two claims under Delaware law—either a claim for discharge of an at-will employee in violation of public policy or a claim for wrongful discharge.[15] In *Finch*, this Court wrote:

> Given that only careful incursions have thus far been made upon the employment at-will doctrine, the Court is convinced the Delaware Supreme Court would not create a common-law public policy exception to the employment at-will doctrine where there is in place an elaborate statutory scheme addressing the same public policy concerns.

*Id.* at 312; *accord Ayres v. Jacobs & Crumplar, P.A.*, 1996 WL 769331, at *11 (Del.Super.Ct. Dec.31, 1996). Brodsky has demonstrated no reason to deviate from that holding here. Accordingly, summary judg-

15. The language of the claim in *Finch* was almost identical to the language of the Count asserted by Brodsky. Finch asserted: "Hercules, motivated by bad faith and malice, wrongfully discharged [him] in violation of the public policy against employment discrimination based on age, as codified in the ADEA and the Delaware Fair Employment Practices Act, 19 *Del. C.* §§ 710–718." *Finch*, 809 F.Supp. 309, 310–11 (D.Del.1992) (quoting record).

ment will be granted as to Count II of the complaint.

### E. Brodsky's Breach of an Implied Covenant of Good Faith and Fair Dealing Claim

■ In Count III of his complaint, Brodsky alleges Hercules "deceitfully and in bad faith" terminated his employment, thus violating an "implied covenant to deal fairly and in good faith" with Brodsky during his tenure at Hercules.

In *E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436 (Del.1996), the Supreme Court of Delaware recognized a narrow exception to the employment at-will doctrine created by an implied covenant of good faith and fair dealing ("the Covenant"). In *Pressman*, the plaintiff alleged his supervisor, angered after the plaintiff confronted him with evidence that he may have had a conflict of interest, engaged in a smear campaign that ultimately succeeded in getting the plaintiff fired. While cautioning "the Covenant limits at-will employment only in very narrowly defined categories[,]" *id.*, at 440, the Delaware Supreme Court recognized the claim as a breach of the Covenant, reasoning that the claim "relates solely to an act or acts of the employer manifesting bad faith or unfair dealing achieved by deceit or misrepresentation in falsifying or manipulating a record to create fictitious grounds to terminate employment." *Id.* at 443–44.

Brodsky crafts two arguments in an attempt to tailor his claim within the holding of *Pressman* and avoid this Court's decision in *Finch v. Hercules*, 809 F.Supp. 309 (D.Del. 1992).[16] First, Brodsky argues, he rejected an offer of early retirement in reliance upon its RIF policy, in which the elder of equally qualified employees would be retained when all other factors are equal, and then Hercules transgressed the letter of that policy. D.I. 34 at 33–34. This argument is not quite coterminous with Brodsky's ADEA claim, as it would first seem, because the ADEA does not require employers to favor employees over the age of forty, as Hercules has chosen to do in its RIF policy. In addition, argues Brodsky, this falls within one of the category of exceptions to the employee at-will doctrine created by the Covenant that was identified by the *Pressman* court: when "the employer misrepresent[s] some important fact, most often the employer's present intentions, and the employee relies thereon either to accept a new position or remain in a present one." 679 A.2d at 442.[17]

But the cases relied upon by the *Pressman* court in identifying this exception demonstrate the employer must make a misrepresentation which is targeted to ensnare a specific employee and alter in some way his status as an at-will employee. For example, in *Shebar v. Sanyo Business Systems Corp.*, 218 N.J.Super. 111, 526 A.2d 1144, 1146 (1987), *aff'd*, 111 N.J. 276, 544 A.2d 377 (1988), when Shebar submitted his letter of resignation to Sanyo because he had received an offer from a Sanyo competitor, Sanyo's executive vice president met with Shebar, "dramatically ripped [his resignation letter] to shreds," and told Shebar that "Sanyo does not fire its managers ... [he] had a job for the rest of [his] life." *Id.*, 526 A.2d at 1146. In reliance on those promises, Shebar stayed with Sanyo, only to discover a few days later that Sanyo was seeking to replace him. *Id.* Shebar was eventually fired four months later.

---

16. In *Finch*, this Court wrote:

Given that only careful incursions have thus far been made upon the employment at-will doctrine, the Court is convinced the Delaware Supreme Court would not create a common-law public policy exception to the employment at-will doctrine where there is in place an elaborate statutory scheme addressing the same public policy concerns.

*Id.* at 312. Brodsky is careful not to claim Hercules has violated the Covenant by engaging in age discrimination, for which there is an elaborate statutory scheme of redress in the form of the ADEA and the DLAD.

17. The other categories of exceptions to the employment at-will doctrine recognized by the *Pressman* court are: (1) those actions by an employer which violate an "explicit and recognizable public policy"; and (2) "when an employer uses its superior bargaining power [to] ... deprive the employee of compensation that is clearly identifiable and is related to the employee's past service." 679 A.2d at 442 (citations and quotations omitted, internal punctuation omitted). Neither of these exceptions is at issue in this case.

In *Wildes v. Pens Unlimited Co.*, 389 A.2d 837, 838–40 (Me.1978), the other case cited in *Pressman,* Wildes relinquished a job as a manager at a costume jewelry manufacturer at the suggestion of the president of his other employer, an office supply store, for whom he worked as a salesman. Approximately two weeks later, however, Wildes' position was eliminated; the Court noted it was a "logical conclusion ... [the president of the office supply store] was well aware of the possibilities of a corporate shake-up at the time it hired the plaintiff [Wildes]." *Id.* at 840 n. 4.

Finally, in *Merrill v. Crothall–American, Inc.,* 606 A.2d 96, 98–99 (Del.1992), the Delaware Supreme Court held an employee had stated a viable claim for breach of the Covenant when he contended his employer hired him merely as a "warm body" and interviewed the person who eventually replaced him only two days after he was offered the job. In *Merrill,* however, the employee had signed a written employment contract and the Delaware Supreme Court reasoned "holding an employer to a requirement of good faith when making employment contracts represents a minimal, and wholly justifiable, interference in the management of its business." *Id.* at 101.

Quite unlike the cases just cited, in this case there is no evidence Hercules issued the RIF policy with the intent to induce Brodsky to forego early retirement. Indeed, there is no evidence Brodsky even saw the RIF policy before the institution of this litigation. Hercules' alleged failure to adhere to one element of its RIF policy, without any direct representation to Brodsky, does not constitute the type of fraud and deceit that falls within the protective cocoon of the Covenant.

Moreover, the premise of Brodsky's first argument is that he and Napolitano were equally qualified. While Brodsky's argument regarding a breach of the Covenant is based on Hercules' RIF policy, it is nonetheless independent of any violation of the ADEA. Brodsky's argument is nothing more than his subjective assessment that he and Napolitano were equally qualified to fulfill the future needs of Hercules. But that assessment is left to the business judgment of Hercules,

not Brodsky. As such, there is no colorable claim for a breach of the Covenant.

Even if the ADEA were a factor in considering whether the Covenant was breached, the result would be the same, albeit for a different reason. Whether Brodsky and Napolitano were equally qualified would then present an issue of fact. But this issue of fact is pivotal to his ADEA claim. This brings Brodsky's claim for breach of the Covenant back into the confines of *Finch;* his claim for breach of the Covenant is blocked by the existence of an elaborate statutory scheme of federal and state law relating to ADEA claims.

■ Brodsky's second argument is Hercules intentionally limited him to rubber work while making a concerted effort to broaden Napolitano's expertise, thus enabling it to justify Brodsky's termination by labeling him as inflexible and insufficiently versatile. D.I. 34 at 34. Again, Brodsky analogizes his claim to *Pressman,* in which an agent of the employer engaged in a scheme of fabrication and deceit in an ultimately successful campaign to have the plaintiff terminated. *See* 679 A.2d at 438–39. *Pressman* is distinguishable from this case, however. *Pressman* can be fairly read to hold the Covenant has been breached when an agent of the employer fabricates a record in order to establish a fictitious basis for an employee's termination. *Id.* at 444. It does not reach the situation presented here, where Hercules has allegedly limited Brodsky's assignments because it no longer wanted to employ him. If Hercules has done so on the basis of Brodsky's age, then Brodsky has a federal and state statutory remedy, which obviates his claim for a breach of the Covenant. *See Finch,* 809 F.Supp. at 312. If Hercules has done so, but not on the basis of Brodsky's age, then Brodsky cannot be heard to complain. As an at-will employee, he was not entitled to an explanation for his dismissal, and there is no allegation a Hercules agent has engaged in deceit or falsified his employment records. Accordingly, the Court declines Brodsky's ambitious invitation to expand further the narrow exceptions to the at-will employment doctrine. *But see EEOC v. Chestnut Hill Hosp.,* 874 F.Supp.

92, 96 (E.D.Pa.1995) (denying summary judgment on claim of breach of implied duty of good faith and fair dealing under Pennsylvania law because employee's federal civil rights claim did not necessarily provide adequate remedy for injuries, and it was possible for jury to find employer's action "was not motivated by a discriminatory animus, but did involve a breach of the duty of good faith and fair dealing."). Summary judgment will be granted as to Count III of Brodsky's complaint.

### F. Brodsky's Claim for Intentional Infliction of Emotional Distress

 In *Konstantopoulos v. Westvaco Corp.*, 690 A.2d 936, 938 (Del.1996), the Delaware Supreme Court, answering a question on certification from the Third Circuit Court of Appeals, considered whether an employee's claim against her employer for intentional infliction of emotional distress caused by sexual harassment arising from and in the course of employment, and not based on any events occurring outside the course of employment, was barred by the Delaware Worker's Compensation Act, DEL. CODE ANN. tit. 19, § 2301 *et seq.* (1985). "The Delaware Worker's Compensation Act, DEL. CODE ANN. tit. 19, § 2304 limits an employee's recovery for personal injuries arising out of and during the course of employment to the compensation provided under the Act, thereby excluding all other claims against the employer[,]" the court noted. *Id.* at 938 (citation omitted). The court further observed "[m]ental injury is included among the personal injuries compensable under the Act." *Id.* at 939. Accordingly, the Delaware Supreme Court held common law actions against an employer for personal injury caused by on-the-job harassment, including claims for intentional infliction of emotional distress, were precluded by Delaware law. *Id.* at 939.

Brodsky's claim for intentional infliction of emotional distress is based on discrimination he allegedly suffered arising from and during the course of his employment at Hercules. The Delaware Supreme Court has spoken in *Konstantopoulos;* Brodsky's claim is barred by the Delaware Worker's Compensation Act.

### IV. CONCLUSION

Summary judgment as to Brodsky's ADEA claims will be denied. His state law claims, however, as found in Counts II through IV, do not survive summary judgment.